# 𝔘nited 𝔖tates 𝔇istrict 𝔆ourt

## for the 𝔑orthern 𝔇istrict of 𝔒klahoma

Case No. 23-cv-354-JDR-JFJ

Megan Slinkard; Jon Slinkard,

*Plaintiffs*,

*versus*

Independent School District No. 1 of Tulsa County, *also known as* Tulsa Public Schools; Alpha Benson, *Interim Principal, in his official and personal capacity*; Deborah Gist, *Superintendent, in her official and personal capacity*,

*Defendants*.

## OPINION AND ORDER

Plaintiff Megan Slinkard had a strained relationship with the administrators at her son's school resulting in several angry exchanges. After Ms. Slinkard entered the school during a lock-down, Defendants TPS, Superintendent Gist, and Principal Benson banned Ms. Slinkard from school property for six months pursuant to Oklahoma Statute title 21, section 1376. Because of the ban, TPS terminated Ms. Slinkard from her employment as a teacher's aide at another TPS school. Plaintiff Jon Slinkard then requested to speak at a TPS Board meeting. TPS Board Policy 1301 requires all public comments to be approved. TPS never approved Mr. Slinkard's request, and he was not permitted to speak. Together, the Slinkards brought this action challenging the constitutionality of the defendants' actions, § 1376, and Policy 1301. Dk. 1.[1]

---

[1] All citations utilize CMECF pagination.

No. 23-cv-354

Principal Benson and Superintendent Gist have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Dkts. 11; 29. They also argue that they are entitled to qualified immunity from plaintiffs' claims. *Id.* The Slinkards have moved for partial summary judgment on their facial challenges to § 1376 and Policy 1301. Dkt. 33. The motions have been fully briefed[2] and are ripe for review. Principal Benson's and Superintendent Gist's motions to dismiss [Dkts. 11; 29] are granted and the Slinkards' motion for summary judgment [Dkt. 33] is denied.

I[3]

The Slinkards' complaint alleges: In 2022, the Slinkards transferred their son from Cushing Public Schools to Tulsa Public Schools to begin eighth grade. Dkt. 1 at 5 (¶ 12). While attending school in Cushing, the Slinkards' son was prescribed an individualized education plan because of his disabilities. *Id.* The Slinkards met with TPS staff to ensure that his IEP would transfer to the new school without issue. *Id.* at 5-6 (¶ 13). That same year, Ms. Slinkard took a position as a teacher's aide at a different TPS school so that she could "watch over [her son] to know when to intervene to keep him safe and his school life stable." *Id.* at 5 (¶ 12).

After the first month of school at TPS, the Slinkards learned that their son's class schedule did not comply with his IEP. Dkt. 1 at 6 (¶ 14). They also learned that teachers referred to their son as "the Cushing boy," disciplined him for using a fidget toy that was allowed under his IEP, and cut off the

---

[2] The Slinkards moved to strike Principal Benson's reply brief under Federal Rule of Civil Procedure 12(f). Dkt. 18. That rule only applies to pleadings as defined under Rule 7(a): complaints, third-party complaints, answers, replies to answers, counterclaims, and crossclaims. Principal Benson's reply [Dkt. 17] is not a pleading, and the Slinkards' motion to strike it is denied.

[3] The following discussion summarizes the allegations as they are set forth in the complaint. The Court accepts these facts as true solely for purposes of this order. *See Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).

No. 23-cv-354

pocket of a shirt he was wearing. *Id.* at 6 (¶¶ 15-16). The Slinkards asked for an IEP meeting to fix these issues, but TPS administration continually postponed the meeting. *Id.* (¶ 14).

Later during the school year, the Slinkards' son was suspended for ten days, which resulted in a meeting between TPS administrators and the Slinkards. Dkt. 1 at 7 (¶ 18). Because of growing animosity between the parties, the Slinkards asked their TPS Board Representative to attend the meeting. *Id.* TPS administrators told them that the representative could not attend the meeting. *Id.* The meeting was held, but the issues with the son's IEP were not addressed. *Id.*

When Ms. Slinkard tried to address her concerns with Principal Benson, he implied "that somehow [the issues] were the son's own fault and cast him as a delinquent needing the disciplinary warnings they were routinely giv[ing] him." Dkt. 1 at 7 (¶ 19). Because of her frustration, Ms. Slinkard lodged "complaints, criticism and possibly even profane language" at Principal Benson as well as other school administrators and staff. *Id.* Principal Benson responded "with his own colorful language." *Id.*

The Slinkards' son was attacked by students in the school bathroom. Dkt. 1 at 8 (¶ 20). Ms. Slinkard did not learn about the altercation until she saw her son walking out of the school with a bloody nose. *Id.* Although videos show three boys following the Slinkards' son into the bathroom and beating him up, and even though the Slinkards' son was the only individual hurt in the fight, Principal Benson "consider[ed] whether [the] son had mutually participated in the fight and [whether he] should be suspended." *Id.* (¶ 21).

On February 3, 2023, Ms. Slinkard entered the school to pick up her son during a lockdown, which was a violation of TPS policy.[4] Dkt. 1 at 9 (¶ 23). TPS banned Ms. Slinkard from TPS properties and activities for six

---

[4] Ms. Slinkard was not aware of the lockdown when she entered the school. Dkt. 1 at 9 (¶ 24).

No. 23-cv-354

months pursuant to Oklahoma Statute title 21, section 1376 for her history of "verbal abuse" and "her behavior violating TPS lockdown policy." *Id.* Ms. Slinkard was also suspended and ultimately terminated from her position as a teacher's aide because of the ban. *Id.* at 9-10 (¶¶ 26-29).

Two weeks later, Mr. Slinkard submitted a request to speak at the February TPS board meeting about "a matter regarding [his] son." Dkt. 1 at 10 (¶ 31). Pursuant to TPS Board Policy 1301, individuals requesting to speak at a board meeting are required to submit the request seven days in advance of the meeting. *Id.* at 10-11 (¶ 32). The request must be "worded so an ordinary individual would understand what the topic is about" so that the topic can be approved by TPS. *Id.* TPS attempted to contact Mr. Slinkard for clarification on his topic but was not able to reach him. *Id.* at 11 (¶ 32). Mr. Slinkard was not permitted to speak because his original request was not sufficiently clear, and TPS did not have the requested clarification from Mr. Slinkard in time for approval prior to the February meeting. *Id.*

Mr. Slinkard submitted a new request for the March meeting, again requesting to speak about "the injustice against his son." Dkt. 1 at 11 (¶ 33). TPS contacted Mr. Slinkard to clarify what topic he wished to speak about. *Id.* TPS "admitted that [it] was concerned with whether Mr. Slinkard would violate [its] Board Policy 1301 and that is why [it] had not approved his March 8th Request." *Id.* Rather than responding, Mr. Slinkard withdrew his request to speak. *Id.*

Over the course of the spring semester, TPS met with the Slinkards twice to address the ongoing issues with their son and the school. Dkt. 1 at 11 (¶ 34). Ms. Slinkard's ban was waived so she could attend both meetings, but her request to permanently lift the ban was denied. *Id.* The Slinkards' son was ultimately transferred to another TPS middle school to complete the school year. *Id.*

No. 23-cv-354

The Slinkards brought this action asserting that the defendants' conduct violated their constitutional rights. Dkt. 1. Superintendent Gist and Principal Benson have moved to dismiss the claims against them [Dkts. 11; 29] and the Slinkards have moved for partial summary judgment on their claims that § 1376 and Policy 1301 are facially unconstitutional [Dkt. 33].

II

The Court first turns to the Slinkards' motion for partial summary judgment, which asks the Court to rule that Oklahoma Statute title 21, section 1376 and TPS Board Policy 1301 are facially unconstitutional. Dkt. 33. The Slinkards argue that § 1376 "is both void for vagueness and so overbroad that it is vulnerable to being arbitrarily used to punish free speech critical of school administrators and board members." *Id.* at 6. They also argue that Policy 1301 "constitutes content regulation and prior restraint of speech in violation of the First Amendment." *Id.*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must "review the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001) (citing *Byers v. City of Albuquerque*, 150 F.3d 1272, 1274 (10th Cir. 1998)).

A

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Slinkards argue that § 1376 is vague to a

No. 23-cv-354

degree that violates the due process clause and Article 2, Section 7 of the Ok-
lahoma Constitution[5] because it does not sufficiently define the conduct the
State aims to prohibit, does not give clear direction to public officials for en-
forcement sufficient to "provide people with fair notice of what is prohib-
ited," and is unclear "regarding the authority of the principal to initiate a ban
after the … conduct." Dkt. 33 at 7, 9. In response, the defendants argue that,
although § 1376 "does not delineate each instance of conduct that may fall
under its terms," it nevertheless "provide[s] people of ordinary intelligence a
reasonable opportunity to understand what conduct it prohibits by providing
examples and focusing on interference with school activities." Dkt. 34 at 12-
13 (citing *United States v. Michel*, 446 F.3d 1122, 1136 (10th Cir. 2006)); *see*
Dkt. 35 at 5. A court can only consider a facial challenge to a law's vagueness
if it implicates First Amendment interests or if the challenge is made before
enforcement. *United States v. Rodebaugh*, 798 F.3d 1281, 1294-95 (10th Cir.
2015) (citations omitted). The Slinkards argue § 1376 implicates a First
Amendment interest. Dkt. 33 at 12.

   A statute can be held vague on its face for two reasons: "First, if it fails
to provide people of ordinary intelligence a reasonable opportunity to under-
stand what conduct it prohibits. Second, if it authorizes or even encourages
arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732
(2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)). "What renders
a statute vague is not the possibility that it will sometimes be difficult to de-
termine whether the incriminating fact it establishes has been proved; but ra-
ther the indeterminacy of precisely what that fact is." *United States v. Wil-
liams*, 553 U.S. 285, 306 (2008). Even statutes which may "restrict expressive

---

[5] The parties' briefs make no distinction between the analysis of the Oklahoma or
federal constitution claims. Accordingly, the Court will analyze the claims together. *See,
e.g., Callaway v. City of Edmond*, 791 P.2d 104, 106 n.1 (Okla. Crim. App. 1990) (Oklahoma's
"due process clause in Art. 2 Sec. 7 has a definitional range that is coextensive with its fed-
eral counterpart.").

No. 23-cv-354

activity" are not required to provide "perfect clarity and precise guidance." *Id.* at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

"[A] federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court." *United States v. Gaudreau*, 860 F.2d 357, 361 (10th Cir. 1988) (citation omitted). The Supreme Court of Oklahoma directs Oklahoma courts to presume that statutes are constitutional and to uphold the statute unless it is "clearly, palpably and plainly inconsistent with the Constitution." *Kimery v. Pub. Serv. Co. of Okla.*, 622 P.2d 1066, 1069 (Okla. 1980) (collecting cases). The statute "should not be held void for uncertainty, if any reasonable and practical construction can be given to its language." *Dowell v. Bd. of Ed. Of Oklahoma City*, 91 P.2d 771, 774 (Okla. 1939) (citing *Trapp v. Dykes*, 282 P. 882 (Okla. 1929)).

Factors the court may consider when deciding if a statute provides fair notice are the enactment's purpose, the harm it attempts to prevent, whether there is a scienter requirement, and the interpretations of individuals charged with enforcement. *Grayned*, 408 U.S. at 110-14. In *Grayned*, the Supreme Court examined an ordinance which prohibited picketing or demonstrations within 150 feet of any school building while school was in session. *Id.* at 107. Because the statute was "written specifically for the school context, where the prohibited disturbances are easily measured by their impact on normal activities of the school," it was not impermissibly vague. *Id.* at 112-14. The Supreme Court contrasted this type of statute from other, more general breach of the peace ordinances because those ordinances permit "persons to be punished for merely expressing unpopular views" and "enforcement depended on the completely subjective standard of 'annoyance.'" *Id.* at 113 (citing *Cox v. Louisiana*, 379 U.S. 536 (1965); *Coates v. Cincinnati*, 402 U.S. 611 (1971)).

Oklahoma Statute title 21, section 1376 allows a school administrator to ban a parent from school grounds for six months if she (1) interferes with

No. 23-cv-354

the peaceful conduct of activities at a school; (2) commits an act which interferes with the peaceful conduct of activities at a school; or (3) enters the school for the purpose of committing an act which may interfere with the peaceful conduct of activities at a school. The statute defines the phrase "interferes with the peaceful conduct" to include:

> Actions that directly interfere with classes, study, student or faculty safety, housing or parking areas, or extracurricular activities; threatening or stalking any person; damaging or causing waste to any property belonging to another person or the institution of learning; or direct interference with administration, maintenance or security of property belonging to the institution of learning.

*Id.* The parties agree that the purpose of the statute is to protect schools and students. Dkts. 33 at 9; 34 at 12; 35 at 3.

Although the Slinkards argue that the statute does not articulate what conduct is prohibited [Dkt. 33 at 9], the statute provides a non-exhaustive list of activities that would be considered interference with the peaceful conduct of school activities. It would be unreasonable to require state legislatures to outline every possible prohibited action because of the "limitations in the English language with respect to being both specific and manageably brief." *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) (quotation marks and citation omitted). A person of ordinary intelligence could determine, in the context of a school, what conduct interferes with the peaceful conduct of school activities. This is in line with other statutes held to be sufficiently definite to satisfy the Constitution's due process requirement.[6]

---

[6] *See, e.g., Grayned*, 408 U.S. at 112 ("We do not have here a vague, general 'breach of the peace' ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school."); *see also Lowery v. Adams*, 344 F. Supp. 446, 455 (D.C. Ky. 1972) (holding that a university's policy was not vague because "the words 'disorderly conduct' and 'disruptive' are not used in a vacuum but are used in connection with interference with the rights of

No. 23-cv-354

For the same reasons, the statute does not authorize or encourage arbitrary and discriminatory enforcement. The Slinkards rely on *Kolender v. Lawson*, 461 U.S. 352 (1983), to argue that § 1376 "invites school administrators to arbitrarily use banning as a retaliatory instrument against problematic parents." Dkt. 33 at 10-11. But *Kolender* is distinguishable. In that case, the statute required an individual subject to a *Terry* stop[7] to provide "credible and reliable" identification. *Kolender*, 461 U.S. at 360-61. The Court recognized that the "credible and reliable" identification requirement "necessarily entrust[s] lawmaking to the moment-to-moment judgment of the policeman on his beat" and had been used as a "convenient tool for harsh and discriminatory enforcement by local prosecuting officials." *Id.* at 360 (quotation marks and citations omitted). As a result, the Supreme Court held that the statute was unconstitutionally vague. *Id.* at 361.

The Court is not convinced that the concerns in *Kolender* are present here. First, § 1376 applies exclusively to conduct on school grounds, not public places. The Supreme Court has recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures …." *New Jersey v. T.L.O.*, 469 U.S. 325, 339-40 (1985). Second, § 1376 provides more notice to the individual and context for when the statute should be applied than the statute in *Kolender*. The statute in *Kolender* left open the standard for officers to determine if the suspect had complied with the identification requirement, but § 1376 limits the school administrator's discretion to whether the individual has disrupted the school environment. Because § 1376 strikes a fair balance between notice to the individual and flexibility for the school officials, it is not impermissibly vague.

---

those who attend the University and more specifically with their right to utilize and enjoy the facilities provided to obtain an education").

[7] A *Terry* stop is a brief detention of an individual by a law enforcement officer who has a reasonable suspicion of criminal activity based on articulable facts. *Terry v. Ohio*, 392 U.S. 1 (1968).

No. 23-cv-354

The Slinkards next argue that § 1376 is facially overbroad. "A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned*, 408 U.S. at 114 (citation omitted). When evaluating an overbreadth challenge, the question is "whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." *Id.* at 115. The Slinkards assert that school administrators can use "the statute's authority [to ban parents from the school] based on the presumption that offending speech criticizing a public official can constitute interference under the statute." Dkt. 33 at 12. The defendants respond that even if a statute could be improperly applied, that does not mean it is necessarily overbroad. Dkts. 34 at 16-17; 35 at 10 (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). The Court agrees with the defendants.

"Facial challenges, … including those based on overbreadth, 'are disfavored'" because such challenges "counteract principles of both judicial restraint and separation of powers." *United States v. Brune*, 767 F.3d 1009, 1019 (10th Cir. 2014) (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008)). The overbreadth doctrine should be employed "sparingly and only as a last resort." *Id.* (quoting *Broadrick*, 413 U.S. at 613). "To succeed in an overbreadth challenge, thereby invalidating *all* enforcement of the law, a challenger 'must show that the potential chilling effect on protected expression is 'both real and substantial.'" *Id.* at 1018 (quoting *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005)). "Finding *some* overbreadth only satisfies part of the inquiry, as the challenger must also show that the 'law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). "[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in

No. 23-cv-354

maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Hicks*, 539 U.S. at 119 (quoting *Broadrick*, 413 U.S. at 615).

Although the State does not have the general power to restrict expressive activity based on the message's content, "reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted." *Grayned*, 408 U.S. at 115 (collecting cases). "The nature of a place [and] 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.'" *Id* at 116 (citation omitted). The Supreme Court has continually recognized that "no mandate in our Constitution leaves States and governmental units powerless to … protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of … buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals." *Carey v. Brown*, 447 U.S. 455, 470-71 (1980) (quotation marks and citation omitted).

School administrators have "the authority … and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property." *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999) (collecting cases). Because of this authority and responsibility, schools "may permissibly regulate a broader range of speech than could be regulated for the general public." *J.S. ex rel Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011) (citing *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002)). School regulations necessarily have "a larger plainly legitimate sweep," requiring courts to adopt a "'more hesitant application,' of the overbreadth doctrine within public schools." *Id.* "[E]xpressive activity may be prohibited if it 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Grayned*, 408 U.S. at 118 (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 513 (1969)).

No. 23-cv-354

Oklahoma has a legitimate state interest "in having an undisrupted school session conducive to the students' learning" in a way that "does not unnecessarily interfere with First Amendment rights." *Grayned*, 408 U.S. at 119; *see, e.g., Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 38 (10th Cir. 2013) (recognizing the "special characteristics of the school environment where the government has a compelling interest in protecting the educational mission of the school and ensuring student safety"). By its very language, § 1376 is specifically focused only on punishing conduct which "interferes with peaceful conduct of activities at a school." Contrary to the Slinkards' argument, the statute does not authorize school officials to ban a person because of the content of their communications. Instead, it authorizes officials to prohibit communication that is inappropriate in nature and behavior that has a disruptive effect. Whether the speech or behavior is disruptive is left to the school administrators where "[t]hat decision is made, as it should be, on an individualized basis, given the particular fact situation." *Grayned*, 408 U.S. at 119. Accordingly, § 1376 is not substantially overbroad and "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 615-16.

The Slinkards' last facial challenge to § 1376 argues that the statute is unconstitutional because it deprives parents of their rights prior to a hearing in violation of the due process clause of the Fourteenth Amendment and Article 2, Section 7 of the Oklahoma Constitution. Dkt. 33 at 13-15. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). But post-deprivation process is sufficient "where a State must act quickly, or where it would be impractical to provide predeprivation process." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases). When

No. 23-cv-354

determining what level of process is required, the Court considers three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the provable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirement would entail." *Matthews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-71 (1970)).

The Slinkards have framed the private interest at issue as a parent's constitutional right to petition the Government on behalf of their children. Dkt. 1 at 15-16 (¶ 45). The Court has doubts that, in effect, § 1376 curtails that interest. The ban undoubtedly prevents the parent from petitioning the school administrators on school grounds, but courts have consistently held that parents do not have a constitutional right to be physically present on school premises. *See, e.g., Lovern*, 190 F.3d at 656 (holding that the plaintiff's "assertions that school administrators must provide him with boundless access to school property are obviously without merit"); *see also Mitchell v. Beaumont Indep. Sch. Dist.*, No. 1:05-CV-195, 2006 WL 2092585, at *10 (E.D. Tex. July 25, 2006) ("The parties have not cited, nor has the court located, any decision interpreting the Due Process Clause to create a parental right of unfettered access to school property or facilities."); *Mejia v. Holt Pub. Schs.*, No. 5:01-CV-116, 2002 WL 1492205, at *6 (W.D. Mich. Mar. 12, 2002) (holding that a parent's right "to direct and control the education of their children" does not "extend or create a right of parents to go onto school property for purposes of participating in the child's education"). Nothing in § 1376 prohibits parents from calling or emailing school administrators to advocate for their child. It only prevents some parents from doing so in person.

To the extent that § 1376 affects a private interest, the State has required school boards to "establish a grievance or appeals procedure and an opportunity for hearing" and to provide parents with "written notice of the

No. 23-cv-354

procedure for requesting a hearing and filing a grievance or appeal." The nature of the hearing required "will depend on appropriate accommodation of the competing interests involved." *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (citations omitted). States have an obvious interest in maintaining order and safety in schools and "hearings require time, personnel, and a diversion of attention from normal school pursuits." *Ingraham v. Wright*, 430 U.S. 651, 680 (1977). "At some point the benefit of an additional safeguard to the individual affected ... and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews*, 424 U.S. at 348.

The Supreme Court has recognized "that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." *Goss*, 419 U.S. at 582-83. This same logic applies to parents with greater force: students are required to attend school, but parents are not. States are not " 'powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of ... schools,' " regardless of the identification of the actor. *Carey*, 447 U.S. at 470-71 (quoting *Gregory v. Chicago*, 394 U.S. 111, 118 (1969) (Black, J., concurring)).

The Court concludes that the State's interests are high in maintaining safety and order in schools, while the restrictions of § 1376 are low, tailored, do not prevent all avenues of communication, and are limited in location. On balance, it is not unconstitutional to allow school administrators to impose this limited ban pending a hearing. Because § 1376 is not impermissibly vague or overbroad and does not deprive individuals of due process, the Slinkards' motion for summary judgment regarding the facial challenges to § 1376 is denied.

No. 23-cv-354

B

The Slinkards argue that TPS Board Policy 1301 violates the due process clause of the Fourteenth Amendment by depriving a person's rights prior to a hearing and violates the First Amendment because it is overbroad and acts as a prior restraint of speech. Dkt. 33 at 15-20. Policy 1301, which allows public comment with prior approval, seeks to exclude certain topics at TPS Board meetings:

> An issue in a pending lawsuit, complaint, or investigation filed with an outside agency, wherein the District, employee(s) or the Board is a party; A pending grievance; A pending employee complaint filed with the District or an outside agency; A complaint against individual employee(s); An employee disciplinary action including suspension or termination; A pending pupil disciplinary action including suspension or appeal that may reach the Board.

Dkt. 33-1 at 6.

First, the Slinkards argue that Policy 1301 is a prior restraint on speech. Prior restraints are "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotation marks and citation omitted). "Any system of prior restraints of expression … bear[s] a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (quotation marks and citation omitted). The Court must "identify the nature of the forum" and then determine "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Corenlius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Determining the type of forum at issue is the first step because "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

No. 23-cv-354

The parties agree that TPS Board meetings are a limited public forum.
Dkts. 33 at 15; 34 at 19; 35 at 12-13. In a limited public forum, "the state may
reserve the forum for its intended purposes, communicative or otherwise, as
long as the regulation on speech is reasonable and not an effort to suppress
expression merely because public officials oppose the speaker's view." *Perry
Educ. Ass'n*, 460 U.S. at 46 (citation omitted); *see also Christian Legal Soc'y v.
Martinez*, 561 U.S. 661, 679 n.11 (2010) ("[A] governmental entity may im-
pose restrictions on speech that are reasonable and viewpoint-neutral.").

Because the board meetings are limited public fora intended to trans-
mit the business of the school district [Dkt. 33-1 at 2], TPS is "justified in
limiting its meeting to discussion of specified agenda items and in imposing
reasonable restrictions … to further the forum's purpose of conducting public
business." *Steinburg v. Chesterfield Cty. Planning Comm'n*, 527 F.3d 377, 385
(4th Cir. 2008). The public comment guidelines are designed to prevent par-
ties from bringing grievances before the Board for which there are alternative
administrative or legal grievance procedures and remedies. Dkt. 33-1 at 6.
And Policy 1301 is exactly the type of guideline that allows the Board to screen
comments to allow the administrative or legal grievance procedures to work.

Restrictions on speech in a limited public forum will be upheld if they
are reasonable and viewpoint neutral. *Good News Club v. Milford Cent. Sch.*,
533 U.S. 98, 106-07 (2001) (citing *Rosenberger v. Rector & Visitors of Univ. of
Va.*, 515 U.S. 819, 829 (1995)). A restriction is based on viewpoint "[w]hen
the government officials target speech because of 'particular views taken by
speakers on a subject.'" *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013)
(quoting *Rosenberger*, 515 U.S. at 829). Policy 1301 is viewpoint neutral be-
cause it restricts the discussion of all issues for which there is a designated
separate and distinct administrative or legal procedure to address issues or
file grievances. *See, e.g., Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at
*7 (10th Cir. 2022) (holding that a policy which prohibited discussion of
"personnel matters" at a board meeting was viewpoint neutral because it did

No. 23-cv-354

not "draw a distinction based on viewpoint"); *Davison v. Rose*, 19 F.4th 626 (4th Cir. 2021) (holding that a board's policy prohibiting all personal attacks at board meetings, regardless of viewpoint, did not violate the First Amendment); *Monroe v. Houston Indep. Sch. Dist.*, No. H-19-1991, 2019 WL 13252407, at *5 (S.D. Tex. July 19, 2019) (holding that the school district "has a legitimate purpose in confining the subject matter of [the school board] meetings to issues regarding the school system and its governance, and the school board's policies expressly limit the content of public comments"). Policy 1301 is a reasonable and viewpoint neutral restriction, and the Slinkards' motion for summary judgment as to its facial validity is denied.

### III

The Court next turns to Principal Benson's and Superintendent Gist's motions to dismiss. When considering whether the Slinkards' complaint, which sets forth three claims under § 1983, states a viable claim for relief, the Court must determine whether the pleading contains enough "factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At this stage, the Court must accept the plaintiffs' well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiffs. *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1304 (10th Cir. 2020) (quoting *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014)). The Court will "'disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable.'" *Doe v. Hutchinson*, 728 F. App'x 829, 832 (10th Cir. 2018) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)).

The Slinkards allege Principal Benson and Superintendent Gist violated their constitutional rights by: (1) denying Ms. Slinkard due process when she was banned from TPS property pursuant to Oklahoma Statute title 21, section 1376 and terminating her employment; (2) retaliating against Ms. Slinkard for exercising her rights under the First Amendment; and (3)

No. 23-cv-354

violating Mr. Slinkard's First Amendment right to free speech by preventing him from speaking at a TPS board meeting. Dkt. 1. These claims were brought against Principal Benson and Superintendent Gist in both their official and individual capacities.

Principal Benson and Superintendent Gist argue that the claims brought against them in their official capacities are duplicative of the claims brought against TPS. Dkts. 11 at 10-12; 29 at 5-7. The Slinkards agree. Dkts. 13 at 4-5; 30 at 4-5. Claims brought against an individual in his official capacity are "'only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)); *see also Griffin v. Indep. Sch. Dist. No. 1 of Tulsa Cty., Okla.*, No. 13-cv-0702-CVE-FHM, 2013 WL 6048988, at *3 (N.D. Okla. Nov. 14, 2013) ("If a governmental entity is already a defendant in a lawsuit, then any official capacity claims against its employees are redundant and may be dismissed."). Accordingly, the Court grants Principal Benson's and Superintendent Gist's motions to dismiss the claims brought against them in their official capacities.[8]

The defendants argue they are entitled to qualified immunity on the claims brought against them individually. Dkts. 11 at 13-21; 29 at 7-10. Defendants argue that the Slinkards cannot establish that the defendants have violated their constitutional or statutory rights and that, as a result, there is no wrong for which relief under § 1983 is appropriate. *Id.* The Slinkards maintain that they have "pleaded sufficient facts to show that [the defendants] violate[d] clearly established constitutional and statutory rights and did so knowingly or at least [they] should have known." Dkts. 13 at 9; 30 at 9.

---

[8] The Slinkards concede that Claim 1 (Okla. Stat. tit. 21, § 1376 is facially unconstitutional) is not brought against the individual defendants, Principal Benson and Superintendent Gist. Dkts. 13 at 4; 30 at 4-5. Accordingly, their motions to dismiss Claim 1 are granted.

No. 23-cv-354

Qualified immunity shields public officials "'from damages actions unless their conduct was unreasonable in light of clearly established law.'" *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). Once a defendant asserts qualified immunity, the burden shifts to the plaintiff to show that: (1) the defendant's actions violated a federal constitutional or statutory right, and (2) the right was clearly established at the time of the defendant's unlawful conduct. *Id.* at 900. The court is required to grant qualified immunity if the plaintiff fails to satisfy this burden. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

## A

First, the Slinkards claim that Principal Benson and Superintendent Gist unconstitutionally banned Ms. Slinkard from TPS property pursuant to Oklahoma Statute title 21, section 1376. Dkt. 1 at 19-20 (¶¶ 56-60). They argue that "[c]ursing in an email or over the phone does not interfere with the daily operation of the school or even peaceful conduct of activities" because the "rude speech … occurred during private communications between [Ms. Slinkard], Principal Benson and other administrative staff in school offices and areas meant for such conversations." *Id.* at ¶ 57. The defendants respond that, given Ms. Slinkard's behavior, the ban was an appropriate exercise of Principal Benson's authority, not an unconstitutional one. Dkts. 11 at 14-15; 29 at 10. Superintendent Gist also independently argues that the Slinkards have failed to allege any causal connection between Superintendent Gist and the ban. Dkt. 29 at 8.

In support of their claim that § 1376 was unconstitutionally applied to Ms. Slinkard, the Slinkards compare the ban to the one issued in *Reiland v. Independent Sch. Dist. No. 11 of Tulsa Cty, Okla.*, No. 22-cv-484-JFH-JFJ, 2022 WL 20689737 (N.D. Okla. Nov. 1, 2022). In *Reiland*, a father was banned from TPS property for six months due to a verbal exchange with a school board member and a newspaper reporter in a parking lot after a school

No. 23-cv-354

board meeting. *Id.* at *1-2. The Court concluded that the plaintiff was likely to succeed on his claim that the ban violated his First Amendment rights. *Id.* at *2-3. In reaching this decision, the Court noted that the verbal exchange was "an isolated incident rather than a history or pattern of behavior" and the conduct took place in the parking lot of the education service center after a board meeting.

The holding in *Reiland* does not preclude the Court from finding that § 1376 was constitutionally applied to Ms. Slinkard when she was banned from TPS property. *See, e.g., Vollmecke v. Independence Sch. Dist.*, No. 23-00644-CV-W-BP, 2024 WL 4524547, at *15, ___ F. Supp. 3d ___ (W.D. Mo. Oct. 11, 2024) ("The fact that Defendants misused or even abused their discretion regarding an otherwise constitutional policy on one occasion and have the potential to do so on future occasions does not make the policy unconstitutional."). "Access to a nonpublic forum ... can be restricted as long as the restrictions are 'reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016) (quotation marks and citations omitted). And the Court in *Reiland* recognized that "[s]hould Plaintiff's conduct on school property become disruptive, Defendants are within their right to ask Plaintiff to leave school grounds ...." 2022 WL 20689737, at *4.

Ms. Slinkard concedes that she would "assert herself," use profane language, and act as "the proverbial thorn in Principal Benson's side" when she would lodge "haranguing petitions on behalf of her son." Dkt. 1 at 7-8 (¶¶ 19, 22). By her own account, Ms. Slinkard demonstrates a history or pattern of disruptive behavior. These conversations took place through email, over the phone, and in the school offices, not in a parking lot or at a public meeting. Dkt. 1 at 19 (¶ 57). The disagreement regarding the lockdown, regardless of what was said, occurred during school hours while school was in session. *Id.* (¶ 58). Principal Benson had discretion under § 1376 to ban Ms. Slinkard, particularly where the ban did not cut off all avenues of advocacy. The Slinkards

No. 23-cv-354

have not established that Principal Benson violated their constitutional rights and have not alleged that Superintendent Gist played any role in banning Ms. Slinkard from TPS property. The Court grants the motion to dismiss Ms. Slinkard's claim that § 1376 was unconstitutionally applied to her.

B

The Slinkards also allege that Ms. Slinkard's procedural due process rights under the Fifth and Fourteenth Amendments of the United States Constitution were violated by her ban from TPS property. The Slinkards assert that the notice, which stated she had ten days to appeal the ban, was insufficient because it did not provide the specific appeal process. Dkt. 1 at 21 (¶ 62). Principal Benson and Superintendent Gist argue that Ms. Slinkard would have been provided more information about the appeal process had she contacted TPS as required, however, because she did not contact TPS, there is no procedural due process violation. Dkts. 11 at 20-21; 29 at 10.

To assert a procedural due process violation, the Slinkards must plausibly allege "(1) a constitutionally cognizable liberty or property interest, (2) a deprivation of this interest, and (3) a lack of constitutionally adequate notice and a hearing." *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 810 F.3d 1161, 1172 (10th Cir. 2016). The Slinkards assert that the liberty interest at issue here is their First Amendment right to free speech, to petition the government "about their child's education, safety and well-being," and to direct the education of their child. Dkt. 13 at 10. But as discussed in Section IIA, *supra*, the Slinkards were not deprived of their right to petition the Government or direct the education of their child. The ban notice states:

> Should you wish to communicate with the staff at the school, you must do so in writing, by email, or by phone. Meetings to discuss academic matters may be held through a virtual meeting on zoom, and additional information regarding such meetings will be provided to you as appropriate.

No. 23-cv-354

Dkt. 1 at 34. The ban did not prevent the Slinkards from contacting TPS administration by phone or email. All avenues for communication with TPS administration remained open; Ms. Slinkard was simply not permitted to physically enter TPS property, where "[t]he right to communicate is not limitless." *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999) (citing *Carey v. Brown*, 447 U.S. 455, 470 (1980)).

Even if Principal Benson or Superintendent Gist deprived the Slinkards of a liberty interest by banning Ms. Slinkard from TPS property, the ban notice was constitutionally adequate. Notice of a proceeding satisfies due process if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (collecting cases). Schools have the authority to ban a person from the premises prior to a hearing if his or her "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process" so long as a "necessary notice and rudimentary hearing … follow[s] as soon as practicable …." *Goss v. Lopez*, 419 U.S. 565, 582-83 (1975); *see also Butler v. Rio Rancho Pub. Schs. Bd. of Educ.*, 341 F.3d 1197, 1201 (10th Cir. 2003) ("There is no doubt the School has a legitimate interest in providing a safe environment for students and staff."). Accordingly, Ms. Slinkard was not entitled to any notice or hearing before the ban was imposed because it was premised on allegations of verbal abuse and behavior violating TPS lockdown policy. Dkt. 1 at 9 (¶ 23).

TPS had an interest in student and staff safety which outweighed the necessity of a hearing before the ban was imposed, if TPS provided Ms. Slinkard with "some kind of hearing, post hoc, that allowed her to be heard and challenge the ban." *Caldwell v. Univ. of New Mexico Bd. of Regents*, 510 F. Supp. 3d 982, 1048-49 (D.N.M. 2020) (quotation marks and citations omitted). Ms. Slinkard was given notice of a post-ban hearing which stated:

No. 23-cv-354

> **Should you desire to appeal this ban** you must notify Dee
> Hendrix with Student and Family Support Services in writing
> within ten (10) calendar days after receipt of this letter. Your
> letter should state clearly that you desire a hearing on the topic
> of being banned from school property. The office of Student
> and Family Support Services will respond to your request.

Dkt. 1 at 34.

The Slinkards argue that this notice was not constitutionally sufficient.
But the notice clearly stated the reasons for the ban and that Ms. Slinkard
must contact TPS to appeal the ban. Ms. Slinkard does not claim that she did
so. And because Ms. Slinkard did not avail herself of the post-deprivation
process, she cannot now allege that the defendants deprived her of that pro-
cess. *See, e.g., Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182,
1194-95 (10th Cir. 2006) (rejecting procedural due process claim where plain-
tiff had failed to avail himself of procedures available to him). Accordingly,
the ban prior to a hearing did not amount to a constitutional violation, and
Principal Benson and Superintendent Gist are entitled to qualified immunity.
The Court therefore dismisses Ms. Slinkard's due process claim.

## C

The Court next considers whether Principal Benson and Superinten-
dent Gist are entitled to qualified immunity as to the Slinkards' retaliation
claim. To state a First Amendment retaliation claim, the Slinkards must allege
that (1) they were engaged in constitutionally protected activity; (2) the de-
fendants' actions caused them to suffer an injury that would chill a person of
ordinary firmness from continuing to engage in that activity, and (3) the de-
fendants' adverse actions were substantially motivated as a response to the
Slinkards exercise of constitutionally protected conduct. *Shero v. City of
Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007). The Slinkards allege that
Ms. Slinkard's ban was retaliation for "petitioning the principal for relief re-
garding the actions of school employees, faculty, and administrators in not
protecting … her son from the bullying he was experiencing and for failure to

No. 23-cv-354

comply with his IEP rights." Dkt. 1 at 22-24 (¶¶ 67-69). Principal Benson and Superintendent Gist argue that there is no causal connection between Ms. Slinkard's advocacy for her son and the ban because the ban was based on "inappropriate speech and conduct in violating the school's lock-down …, not her advocacy on behalf of her son." Dkts. 11 at 19-20; 29 at 9-10.

The Tenth Circuit has recognized that "a private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress" whether the cause is "minor and questionable," or "mighty and consequential." *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007); *see also Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 587-88 (6th Cir. 2008) (mothers' complaints to superintendent, newspaper, government officials and agencies about treatment their children received in schools was constitutionally protected activity). Although Ms. Slinkard's advocacy for her son might be protected by the First Amendment, the Court holds that Ms. Slinkard fails to sufficiently allege the second element of a retaliation claim.

The Slinkards allege that Ms. Slinkard's ban from TPS property would chill "an ordinary person" in the exercise of his or her First Amendment rights, but the facts alleged in the complaint do not support this claim. The ban did not chill Ms. Slinkard from continuing to advocate for her son and seek redress from TPS. Ms. Slinkard went on to meet with TPS staff on two separate occasions "to address how [TPS] could help meet their son's special needs to keep him in the … school system." Dkt. 1 at 11 (¶ 34). The ban would not chill an ordinary person in the exercise of his or her rights because a banned individual still has opportunity to advocate for their child, as evidenced by Ms. Slinkard's continued communication with TPS even after the ban was in place. Principal Benson and Superintendent Gist are entitled to qualified immunity because the complaint fails to state a valid First Amendment retaliation claim. *See, e.g., Cunningham v. Lenape Reg'l High Dist. Bd. of Educ.*, 492 F. Supp. 2d 439, 449 (D.N.J. 2007) (holding that there was no

24

No. 23-cv-354

constitutional violation where there was no indication that plaintiff "was denied in the past or will be denied in the future the right to exercise his First Amendment rights of speech or petition" because the plaintiff was "free to contact the school and even access the school in an appropriate manner"). The Court grants the motion to dismiss the Slinkards' retaliation claim.

## D

The Court now turns to whether Principal Benson and Superintendent Gist are entitled to qualified immunity as to the Slinkards' claim that defendants violated Mr. Slinkard's First Amendment right "by not permitting him to speak at a school board public meeting under unconstitutional provisions of [TPS] School Board Policy 1301." Dkt. 1 at 24 (¶ 71). As discussed above in Section IIB, *supra*, Policy 1301 is a constitutionally permissible viewpoint neutral restriction. The question then is whether the TPS board unconstitutionally applied Policy 1301 to Mr. Slinkard.

Looking first to Mr. Slinkard's request to speak at the February meeting, the Slinkards allege that the request was not approved in time to allow Mr. Slinkard to speak because TPS "could not reach Mr. Slinkard to clarify with more specificity what his comments would discuss." Dkt. 1 at 11 (¶ 32). TPS has the constitutional right to limit comments at its board meeting to issues regarding the school system and its governance and prohibiting comments about issues that must be resolved through other prescribed means. Without the requested information, TPS was not able to assess whether Mr. Slinkard's comments aligned with Policy 1301. The Court does not view this as a denial by TPS, and thus there was no constitutional violation.

There was also no denial by TPS regarding Mr. Slinkard's request to speak at the March meeting. As alleged, Mr. Slinkard submitted a second request to speak "regarding the injustice against his son," and TPS asked for further clarification. *Id.* (¶ 33). TPS stated that it "was concerned with whether Mr. Slinkard would violate … Policy 1301" which is also why the

No. 23-cv-354

February request had not been approved without clarification. *Id.* Rather than provide TPS with additional information so it could determine if the comments were in line with the policy, Mr. Slinkard withdrew his request. Mr. Slinkard, not TPS, is responsible for his inability to speak at either meeting. There was no constitutional denial of Mr. Slinkard's opportunity to speak at the meeting. Principal Benson's and Superintendent Gist's motions to dismiss the Slinkards' claim for prior restraint of free speech is denied.

## IV

Both Oklahoma Statute title 21, section 1376 and TPS Board Policy 1301 are facially constitutional. The Slinkards' motion for partial summary judgment [Dkt. 33] is denied. And because Principal Benson and Superintendent Gist did not violate the Slinkards' constitutional rights, they are entitled to qualified immunity. Their motions to dismiss [Dkts. 11; 29] are granted.

DATED this 31st day of March 2025.

_____

JOHN D. RUSSELL
*United States District Judge*